******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## CITY OF WATERBURY *v.* TOWN OF WATERTOWN
### (AC 46784)

Elgo, Moll and Westbrook, Js.

*Syllabus*

The defendant town appealed from the trial court's judgment for the plaintiff city with respect to the plaintiff's action to collect certain unpaid fees for the use of its water and sewer services. The defendant claimed, inter alia, that the court improperly concluded that, in the absence of a contractual agreement, the plaintiff was authorized by statute (§§ 7-239 and 7-255) to set the rates it charged properties located in the defendant municipality for the continued use of its water and sewer services. *Held*:

The trial court properly construed §§ 7-239 and 7-255 as authorizing the plaintiff to set just and equitable rates for the continued use of its water and sewer systems by properties located in the defendant municipality following the expiration of contracts between the parties relating to such use.

The trial court properly concluded that, pursuant to statute (§§ 7-239, 7-255 and 7-258), the plaintiff was permitted to bring an action against the defendant to recover unpaid water and sewer service charges incurred by properties within the defendant municipality because the defendant had elected to collect payment for such charges.

The trial court's finding that the rates set by the plaintiff for water and sewer services were reasonable and equitable was not clearly erroneous.

Argued January 8—officially released June 10, 2025

*Procedural History*

Action for the collection of certain unpaid fees for water and sewer services provided by the plaintiff, and for other relief, brought to the Superior Court in the judicial district of Waterbury and tried to the court, *Cordani, J.*; judgment for the plaintiff, from which the defendant appealed to this court. *Affirmed.*

*Daniel J. Krisch*, with whom, on the brief, were *David P. Friedman* and *Lorey C. Leddy*, for the appellant (defendant).

*Joseph A. Mengacci*, corporation counsel, with whom was *Daniel J. Foster*, corporation counsel, for the appellee (plaintiff).

*Opinion*

ELGO, J. The defendant, the town of Watertown, appeals from the judgment of the trial court, rendered after a bench trial, in favor of the plaintiff, the city of Waterbury. On appeal, the defendant claims that the court improperly (1) concluded that, in the absence of a contractual agreement, General Statutes §§ 7-239[1] and 7-255[2] authorize the plaintiff to set the rates it charges properties located in the defendant municipality for the continued use of its water and sewer services, (2) concluded that those statutes impliedly authorize the plaintiff to sue the defendant to collect unpaid water and sewer service charges incurred by those properties, and (3) found the plaintiff's water and sewer service rates to be reasonable and equitable. We affirm the judgment of the trial court.

The plaintiff is authorized, by special act of the General Assembly, to obtain water from outside its borders; see 11 Spec. Acts 322, No. 252, § 1 (1893); and to contract to supply water to any municipality through which its water supply mains run. See 18 Spec. Acts 904, No. 391 (1921).[3] The plaintiff also is statutorily authorized to contract to provide sewer services to adjoining municipalities. See General Statutes § 7-273.[4] Pursuant

---

[1] Although § 7-239 has been amended by the legislature since the events underlying this case; see Public Acts 2021, No. 21-143, § 4; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] Although § 7-255 has been amended by the legislature since the events underlying this case; see, e.g., Public Acts, Spec. Sess., June, 2021, No. 21-2, § 164; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] That special act provides in relevant part that the plaintiff "is authorized and empowered . . . to contract to supply water for domestic purposes and fire protection to any municipality, borough or fire district, through which, or contiguous to which the water supply mains of said city are or shall be laid . . . ." 18 Spec. Acts 904, No. 391 (1921).

[4] General Statutes § 7-273 provides: "Any town, city, borough or fire or sewer district, maintaining a sewerage system, may contract with any adjoining town or property owner therein for connection with and the use of such sewerage system."

to that authority, the plaintiff contracted to supply water and sewer services to the defendant for more than sixty years. This case involves an action to collect unpaid charges for water and sewer services.

In its memorandum of decision, the court found the following relevant facts. The plaintiff first supplied water services to the defendant in 1939 and sewer services to the defendant in 1951. "Starting on or about June 29, 1988, [the plaintiff] provided water and sewer services to [the defendant] pursuant to written agreements between the parties with terms of twenty-five years. During [those contractual periods], [the plaintiff] charged, and [the defendant] paid . . . rates [that] were less than the rates that [the plaintiff] charged to its own residents. . . .

"In conjunction with the expiration of the foregoing agreements, the parties negotiated and abided by new subsequent agreements, which started in 2013 and terminated five years later, on June 30, 2018. These 2013 water and sewer agreements applied flat rates for water and sewer service[s] and applied an escalator to those rates at 2 percent per year."[5] (Footnotes omitted.)

The court further found that, "[i]n advance of the termination of their 2013–2018 agreements, the parties attempted to negotiate a further agreement but failed to reach an agreement. Accordingly, as of June 30, 2018, no agreement existed between the parties concerning the provision of water and sewer services, and there

---

[5] The court also found that "[t]he negotiations for the 2013–2018 agreements [between the parties] began in 2012. During these negotiations, the [plaintiff's mayor] informed [the defendant] that [the plaintiff] would seek to impose the [plaintiff's] resident standard rates on [the defendant] after these 2013 contracts expired in five years, and that the 2 percent per year escalator, as applied to the flat rates in the agreements, was a start in that direction. Accordingly, [the defendant] had substantial notice of [the plaintiff's] intent concerning pricing, which notice preceded the 2015 public meetings which set the prices at issue."

was no agreement concerning the rates to be charged. Despite there being no agreement between the parties, [the plaintiff] continued to provide, and [the defendant] continued to consume, water and sewer services. . . . [The plaintiff] deployed good faith efforts to achieve new agreements, or amended 2013 agreements, but, despite those good faith efforts, no agreement arose after the expiration of the 2013 agreements on June 30, 2018. . . .

"In December of 2017, [the plaintiff] again firmly advised [the defendant] that, in the absence of a negotiated agreement, [the plaintiff] would charge [the defendant] the same rates for water and sewer service that it charged [its own] residents, plus a 10 percent municipal system benefit charge on the water rates. Ultimately, [the plaintiff] further informed [the defendant] of its position in a letter dated June 8, 2018. . . .

"[The plaintiff's] independent water and sewer consultants conducted studies in 2014 to make recommendations to [the plaintiff] for water and sewer rates for the period from 2015 through 2019, and made the following findings and recommendations: (a) [the plaintiff's] water and sewer rates had been insufficient to support the short and long-term financial needs of [the plaintiff's] systems, and [the plaintiff] had been funding deficits through other means, including the use of reserves; (b) there had been underinvestment by [the plaintiff] in its aging water and sewer systems over the years and that underinvestment [necessitated] substantial capital expenditures in the near-term coming years; (c) [the plaintiff] needed to build a capital reserve to plan for required capital investments; (d) the annual cost of operating [the plaintiff's] water system [was] expected to increase from under $12 million in 2015 to $13.7 million in 2019, a 3.4 percent per year increase, and $35 million in capital improvements to the water system

were required over the coming five years; (e) [the plaintiff's] water and sewer charges to its customers were substantially lower than other comparable Connecticut suppliers; [and] (f) the rate recommendations made by [the consultants] were designed on a break-even basis for [the plaintiff's] operations, but [the plaintiff] chose lower rates and increases than those recommended by [the consultants]. Accordingly, [the plaintiff's] rates for 2015 through 2019 still did not produce break-even operations. . . .

"[S]tarting in 2015, pursuant to [§] 7-239, [the plaintiff] established rates to be charged for persons or entities being supplied water by the [plaintiff's] waterworks. The rate set was $2.31 per hundred cubic feet of water for 2015, $2.43 for 2016, $2.47 for 2017, and $2.52 for 2018 through 2021. . . . In 2022, the rate was increased to $2.65 per hundred cubic feet of water. The foregoing rates were set after publication and public hearings as required in the statute. These rates were adopted by [the plaintiff's] Board of Aldermen. . . . The court found no credible evidence of any irregularity in the procedures used by [the plaintiff] to set its rates. . . .

"[S]tarting in 2015, pursuant to [§] 7-255, [the plaintiff] established rates to be charged for persons or entities using the [plaintiff's] sewer system. The rate was set at $2.472 per hundred cubic feet for 2019 through 2022. . . . The foregoing rate remains in effect today. [That] rate was set after publication and public hearings as required in the statute . . . [and was] adopted by [the plaintiff's] Board of Public Works. . . . The court found no credible evidence of any irregularity in the procedures used by [the plaintiff] to set its rates. . . .

"The rates adopted by [the plaintiff] in 2015 for water and sewer [services] were less than the rates recommended by [the plaintiff's] independent water and sewer consultant. Further, the rates adopted in 2015

by [the plaintiff] . . . were not sufficient to make the [plaintiff's] water and sewer enterprises self-sufficient. [The plaintiff] adopted these low 2015 rates in an effort to slowly bring its water and sewer enterprises up to self-sufficiency without overwhelming its citizens. . . .

"The rates for water and sewer [services] adopted by [the plaintiff] in 2015 were charged to [all of the plaintiff's] residents and businesses regardless of size, location . . . and usage. [The plaintiff] also applied these rates to the towns of Naugatuck, Cheshire, Middlebury and Prospect. All municipalities currently acquiring water from [the plaintiff] pay 110 percent of [the plaintiff's] standard rate for water, and all municipalities, other than Wolcott, which use [the plaintiff's] sewer services pay 100 percent of [the plaintiff's] standard rate. It was reasonable for [the plaintiff] to adopt a uniform system of pricing, particularly since [the plaintiff's] accounting system did not support accurate costing of distinctions or classes. . . .

"Prior to the expiration of the 2013 agreements with [the defendant], [the plaintiff] notified [the defendant] that, starting July 1, 2018, [the plaintiff] would begin charging [the defendant] at [the plaintiff's] standard resident rate plus 10 percent for water [services] and at [the plaintiff's] standard resident rate for sewer service. . . . [On] July 1, 2018, [the plaintiff] began charging [the defendant] $2.52 per hundred cubic feet of water plus an additional 10 percent municipal system benefit charge and $2.472 per hundred cubic feet of sewage plus a capital recovery charge of $1.481 per hundred cubic feet of sewage. These rates were the rates charged by [the plaintiff] to its residents and other surrounding [municipalities], but were higher than the contractual rates previously charged to [the defendant] pursuant to the previously expired contracts. . . . [The defendant] has not paid the foregoing rates and has

short paid the invoices issued by [the plaintiff] for the period beginning on July 1, 2018.[6] . . .

"During the foregoing time periods, [the plaintiff] has charged municipalities other than [the defendant] the rates that [the plaintiff] established pursuant to §§ 7-239 and 7-255 . . . . Commencing on July 1, 2018, [the plaintiff] began charging [the defendant] interest at the rate of 18 percent per year on the amounts [the plaintiff] claimed were due because of [the defendant's] practice of short paying [the plaintiff's] invoices. . . .

"[The defendant] directly charges its residents for water and sewer services and, thus, bears the cost and burden of collection. [The defendant] also owns the pipes and other equipment located within [its] borders (except for certain supply and collection stations and the primary supply pipes), which are used to distribute water and sewer services within [the defendant municipality] to [its] residents.

\* \* \*

"In 2013, while negotiating the 2013 agreements, [the plaintiff's mayor, Neil O'Leary] informed [the defendant's counsel] that the rates and [the 2 percent per year] escalator in the 2013 agreements were meant to transition [the defendant] to [the plaintiff's normal] resident rates for water and sewer service and that, after the 2013 agreements expired in 2018, [the plaintiff] would charge [the defendant] 110 percent of [the plaintiff's normal] resident rate for water and 100 percent of [its normal] resident rate for sewer services.[7] . . .

---

[6] In its memorandum of decision, the court found that the rates for water and sewer service proposed by the defendant "were unreasonable in the extreme and should have been known as such by [the defendant] and its experts." The court further noted that "[t]hese extremely unreasonable rate proposals [by the defendant] cause the court to question whether they were arrived at and suggested in good faith."

[7] In its memorandum of decision, the court found Mayor O'Leary's testimony "to be reliable and credible."

"Over the years, federal regulatory mandates have made it substantially more costly for [the plaintiff] to operate its water and sewer systems. When the . . . water and sewer contracts [between the parties] expired in 2018, Mayor O'Leary, on behalf of [the plaintiff], did not cut off water and sewer service to [the defendant] because he understood that doing so would give rise to catastrophic problems for [the defendant's] residents and he did not think that to be an appropriate manner in which to treat neighbors. . . . Other sources for the supply of water to [the defendant] would be substantially more expensive than the rates charged by [the plaintiff] to its residents and now to [the defendant]." (Citations omitted; footnotes added; footnotes omitted.)

The court also found that the defendant was "a direct and indirect user" of the plaintiff's water and sewer services. As the court stated: "[The defendant] acts on behalf of and stands in the shoes of the residents and property owners of [the defendant municipality] whose property is connected to and who use [the plaintiff's] waterworks. . . . The [properties in the defendant municipality] are connected to [the plaintiff's] water delivery and sewer systems, albeit initially through pipes owned by [the defendant]. Further, [the defendant] itself is a property owner whose properties are connected to and serviced by [the plaintiff's] water and sewer systems, making [the defendant] itself a direct user and property owner connected to [the plaintiff's] systems."

When the defendant refused to pay for water and sewer services provided to properties in the defendant municipality at the rates that became effective on July 1, 2018, the plaintiff commenced the present action. The plaintiff filed an amended complaint on January 27, 2020, in which it sought to collect unpaid water fees pursuant to § 7-239 and unpaid sewer fees pursuant

to General Statutes §§ 7-255 and 7-258. The defendant thereafter filed an answer and eight special defenses, which the plaintiff denied in their entirety.[8]

A four day bench trial was held in May, 2023, at which both parties presented documentary and testimonial evidence. On July 28, 2023, the court issued its memorandum of decision. The court found that "[the defendant] has short paid [the plaintiff's] invoices for water and sewer service since July 1, 2018. [The plaintiff] billed $23,455,544.42 in aggregate principal for water and sewer service from July 1, 2018, through April 25, 2023. . . . Because of [the defendant's] practice of short paying invoices, [the plaintiff] has applied interest at 18 percent per year on unpaid amounts, which results in an aggregate interest charge of $4,637,784.58 over the period from July 1, 2018, through April 25, 2023."[9] (Footnote omitted.) In addition, the court found that

---

[8] In its special defenses, the defendant alleged in relevant part that (1) the "statutory rate scheme [invoked by the plaintiff] is inapplicable"; (2) the doctrine of municipal estoppel applied; (3) the plaintiff failed to comply with "a mandatory presuit mediation provision" contained in the parties' most recent contract; (4) the defendant maintained its own water and sewer infrastructure and, therefore, "should not pay water or sewer rates that include [the plaintiff's] full infrastructure costs"; (5) the water and sewer rates charged by the plaintiff "are not fair and reasonable or just and equitable under Connecticut law"; (6) the water and sewer rates charged by the plaintiff "were set in an arbitrary and capricious manner"; (7) the water and sewer rates charged by the plaintiff "were not the subject of a mandatory published legal notice and public hearing"; and (8) the water and sewer rates charged by the plaintiff "include capital expenses for which [the defendant] has been paying its fair share . . . ."

After the close of pleadings, the plaintiff filed a motion for summary judgment. The trial court denied that motion, concluding that genuine issues of material fact existed as to whether the rates set by the plaintiff for water and sewer services were reasonable and whether the doctrine of municipal estoppel applied.

[9] Pursuant to §§ 7-239 (b) and 7-258 (a), unpaid water and sewer service charges bear interest at the same statutory rate as unpaid taxes. See General Statutes § 12-146 ("the delinquent portion of the principal of any tax shall be subject to interest at the rate of eighteen per cent per annum from the time when it became due and payable until the same is paid").

the defendant had not proven any of its special defenses. The court thus rendered judgment in favor of the plaintiff in the amount of $18,800,445.37 for "unpaid principal and interest for water and sewer services" for the period from July 1, 2018, to April 25, 2023. From that judgment, the defendant now appeals.

I

On appeal, the defendant claims that the court improperly concluded that, in the absence of a contractual agreement, §§ 7-239 and 7-255 authorize the plaintiff to set the rates it charges properties located in the defendant municipality for the continued use of its water and sewer services. We disagree.

As the defendant notes in its principal appellate brief, its claim requires this court to consider "the meaning of the statutory language as applied to the facts of [the] case . . . ." (Internal quotation marks omitted.) *Dept. of Transportation* v. *White Oak Corp.*, 332 Conn. 776, 782, 213 A.3d 459 (2019). For that reason, we begin by noting what is not at issue in this appeal. This case is not about whether the plaintiff may enter into a contract with other municipalities to provide water and sewer services; it is statutorily authorized to do so. See 18 Spec. Acts 904, No. 391; see also General Statutes § 7-273. This case also is not about whether the plaintiff is authorized to set unilaterally the rates it charges for water and sewer services provided to properties in a municipality with which it had no prior contractual relationship. It is undisputed that the parties in the present case contracted for such services for more than sixty years.

Rather, the question presented in this appeal concerns the scenario in which (1) a contractual relationship existed between the plaintiff and the defendant and (2) during that contractual time period, the plaintiff set new rates for the continued use of its water and

sewer services by properties located in the defendant municipality following the expiration of that contractual period. On appeal, the defendant contends that the plaintiff lacked authority to do so.

The defendant's claim involves an issue of statutory interpretation, over which our review is plenary. See, e.g., *777 Residential, LLC* v. *Metropolitan District Commission*, 336 Conn. 819, 827, 251 A.3d 56 (2020). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019).

In addition, we note that, "as a creation of the state, a municipality has no inherent powers of its own. . . . A municipality has only those powers that have been expressly granted to it by the state or that are necessary for it to discharge its duties and to carry out its objects and purposes." (Citations omitted; internal quotation marks omitted.) *Wright* v. *Woodridge Lake Sewer District*, 218 Conn. 144, 148, 588 A.2d 176 (1991).

A

We first consider the applicability of § 7-239, which concerns rates for water services provided by municipalities. Section 7-239 (a) provides in relevant part: "The

legislative body [of the municipality] shall establish just and equitable rates or charges for the use of the waterworks system authorized in this subsection, to be paid by the owner of each lot or building which is connected with and uses such system, and may change such rates or charges from time to time. . . . No such rate or charge shall be established until after a public hearing at which all the users of the waterworks system and the owners of property served or to be served and others interested shall have an opportunity to be heard concerning such proposed rate or charge. . . . The rates or charges so established for any class of users or property served shall be extended to cover any additional premises thereafter served which are within the same class, without the necessity of a hearing thereon. . . .”

By its plain language, the first sentence of § 7-239 (a) authorizes the plaintiff to set “just and equitable rates or charges for the use of [its] waterworks system” and to “change such rates or charges from time to time.” That provision broadly and unambiguously applies to “each lot or building which *is connected with and uses* such system . . . .” (Emphasis added.) General Statutes § 7-239 (a). Had the legislature intended to limit the applicability of that grant of authority only to properties located within the municipality that owned the waterworks system, it certainly knew how to do so. See *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 219, 38 A.3d 1183 (“it is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . or to use broader or limiting terms when it chooses to do so” (citation omitted)), cert. denied, 568 U.S. 940, 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012). The plaintiff’s statutory authority to set rates for the use of its waterworks system pursuant to § 7-239 plainly is not confined to properties located within its geographical boundaries

but, rather, extends to any property that is connected with and uses the waterworks system.[10] See General Statutes § 7-239 (a).

In its principal appellate brief, the defendant appears to concede as much. Because § 7-239 (a) provides that such rates shall be "paid by the owner of each lot or building which is connected with and uses [the water-works] system," the defendant submits that "[*p*]*roperty owners that use a municipal waterworks system* must pay 'just and equitable rates' to the municipality that owns it . . . ." (Emphasis altered.) That averment provides further support for a construction of § 7-239 (a) that authorizes the plaintiff to set rates for all properties that use its waterworks system, including those in the defendant municipality that are owned by the defendant.[11]

The aforementioned provisions of subsection (a) also must be read in context of the entire statute. See *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 408, 999 A.2d 682 (2010) (statutory provision cannot be "interpreted in a vacuum, without reference to the statute's other provisions"); *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 116, 584 A.2d 1172 (1991) ("[w]e construe a statute as a whole and read its subsections concurrently in order to reach

---

[10] Although 18 Spec. Acts 904, No. 391, permits the plaintiff to enter into contractual agreements with other municipalities regarding the procurement of water services; see footnote 3 of this opinion; it neither obligates the plaintiff to do so nor precludes the plaintiff from providing such services to properties in other municipalities at rates established pursuant to § 7-239 in the absence of a contractual agreement. See *Fredette* v. *Connecticut Air National Guard*, 283 Conn. 813, 836, 930 A.2d 666 (2007) (courts "read statutes to be consistent, rather than to conflict, with each other"); see also General Statutes § 7-148 (c) (4) (granting municipalities "the power" to "(G) [p]rovide for the furnishing of water, *by contract or otherwise*" (emphasis added)).

[11] The court found, and the defendant does not dispute, that the defendant "itself is a property owner whose properties are connected to and serviced by the [plaintiff's] water and sewer systems . . . ."

a reasonable overall interpretation"). Section 7-239 (a) also mandates that "[n]o such rate or charge shall be established until after a public hearing at which all the users of the waterworks system and the owners of property served or to be served and others interested shall have an opportunity to be heard concerning such proposed rate or charge. . . ." It further provides in relevant part that "[t]he rates or charges so *established for any class of users or property served* shall be extended to cover any additional premises thereafter served which are within the same class, without the necessity of a hearing thereon. . . ." (Emphasis added.) General Statutes § 7-239 (a). Those provisions expressly and unambiguously require notice of rate changes to "all the users of the waterworks system and the owners of property served" and indicate that such rates may be established "for any class of users or property served . . . ." General Statutes § 7-239 (a). Moreover, § 7-239 (j) provides in relevant part that, in a civil action to collect unpaid charges, "[t]he municipality shall be subject to the same rates or charges under the same conditions *as other users of such waterworks system.*" (Emphasis added.) Read together, those various provisions compel the conclusion that § 7-239 authorizes the plaintiff to set rates for all properties that use its waterworks system.

In construing § 7-239, we also are mindful that "common sense must be used in statutory interpretation, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 141, 680 A.2d 1329 (1996). Furthermore, it is a "well established canon of statutory construction that those who promulgate statutes . . . do not intend to promulgate [ones] . . . that lead to absurd consequences or bizarre results." (Internal quotation marks omitted.) *Modzelewski's Towing & Recovery, Inc.* v. *Commissioner of Motor*

*Vehicles*, 322 Conn. 20, 36, 139 A.3d 594 (2016), cert. denied, 580 U.S. 1216, 137 S. Ct. 1396, 197 L. Ed. 2d 554 (2017). The defendant contends that construing § 7-239 as authorizing the plaintiff, in the absence of a contract, to set rates for users of its waterworks system in other municipalities creates an absurd result by "giving the plaintiff nearly unfettered power to charge [those users] whatever it wants for water." For two reasons, we disagree.

First, § 7-239 contains a critical limitation on a municipality's ability to set rates for water services. Pursuant to § 7-239 (a), any rates or charges established for the use of a municipal waterworks system must be "just and equitable . . . ." That statutory requirement serves as a formidable check on municipal authority to set rates and belies the defendant's claim of the plaintiff's "unfettered power" to impose rates that are unjust or inequitable. The statute also provides a barometer by which the reasonableness of such rates may be measured, providing in relevant part that "[s]uch rates or charges shall be sufficient in each year for the payment of the expense of operation, repair, replacements and maintenance of such system and for the payment of the sums in this subsection required to be paid into the sinking fund. . . ." General Statutes § 7-239 (a). In the present case, the court found, and the evidence in the record confirms, that the plaintiff "adhered to" that statutory imperative and established "rates that [were] lower than required to fund the short and long-term needs of the [waterworks system]."

Second, we reiterate the particular factual scenario presented in this appeal, wherein a contractual relationship for the provision of water services previously existed between the parties and, during that contractual time period, the plaintiff set new rates for the continued use of its water services following the expiration of that contractual period. In that context, the defendant's

"unfettered power" argument rings hollow in light of the undisputed facts that (1) the defendant was provided ample notice of the plaintiff's intention to increase the rate for properties in the defendant municipality that used its waterworks system,[12] (2) the defendant was under no obligation to continue procuring water service from the plaintiff once their contractual relationship concluded in 2018, and (3) the defendant, at that time, was free to contract with other water service providers.[13]

In our view, the defendant's construction of § 7-239 is predicated on a faulty premise—namely, that if a municipality is authorized to set the rate that it charges for the use of its waterworks system by properties located in other municipalities, those properties are left with no choice but to pay that rate.[14] The defendant has provided no legal authority or evidentiary basis for that assertion. Moreover, the record before us contains evidence that the defendant can obtain water services from alternative providers and was not obligated to continue its relationship with the plaintiff. At trial, Mayor O'Leary testified that the defendant had the option of procuring water services from the Connecticut Water Company and Aquarion Water Company, two alternative providers, albeit at rates higher than those charged by the plaintiff.[15] In its memorandum of decision, the court found Mayor O'Leary's testimony "to be reliable and credible."

---

[12] As the court found, the defendant "was clearly forewarned in 2013 that, when the 2013 agreements expired in 2018, [the defendant] would be treated uniformly with [the plaintiff's] other customers and charged the rates . . . charged to [the plaintiff's] residents."

[13] In its memorandum of decision, the court specifically found that "[o]ther sources for the supply of water" to properties in the defendant municipality existed, but that they "would be substantially more expensive than the rates charged by [the plaintiff] . . . ."

[14] At oral argument before this court, the defendant's counsel characterized the defendant as a "captive customer" of the plaintiff.

[15] Mayor O'Leary further testified that, after negotiations between the parties failed to produce an agreement in 2018, the plaintiff informed the

In addition, it bears emphasis that, at the time that the rates in question were set by the plaintiff in 2015, the defendant was a user of the plaintiff's waterworks system, both as an owner of property that is connected to and serviced by the plaintiff's water system; see footnote 11 of this opinion; and as the entity that delivered water services from the plaintiff to properties in the defendant municipality and collected payment from their owners.[16] Following the increase in rates that became effective on July 1, 2018, the defendant elected to continue its use of the plaintiff's waterworks system and declined to secure water services from alternative providers.[17]

Given that context, we agree with the trial court that the defendant's construction of § 7-239 would create an absurd and unworkable result. As the court observed: "[The defendant's] position that [the plaintiff] can only

defendant that it would have to find "alternative sources" for water and sewer services and that he "encouraged" the defendant to do so. When the defendant elected to continue utilizing the plaintiff's water and sewer services following the expiration of the parties' contractual agreements, Mayor O'Leary testified that the plaintiff was left with "only . . . one option," which was "[t]o shut the water off [to the defendant] and stop taking [the defendant's sewage]." When asked why he did not "direct that particular course of conduct to take place," Mayor O'Leary replied: "Because I didn't think it was right for the people of [the defendant municipality] or any municipality to do—I couldn't fathom doing that to a neighboring community."

[16] As the court found, the defendant "directly charges its residents for water and sewer services and, thus, bears the cost and burden of collection. [The defendant] also owns the pipes and other equipment, located within [its] borders . . . which are used to distribute water and sewer services within [the defendant municipality] to [its] residents."

[17] The court found, and the record indicates, that the defendant "continued to consume water and sewer services" provided by the plaintiff following the expiration of their contractual agreements. The court also found that the defendant partially paid for water and sewer services provided by the plaintiff from July 1, 2018, through April 25, 2023, "at the rates provided for in the [expired contractual] agreements despite the fact that [the defendant] acknowledges that those agreements expired . . . on June 30, 2018, and were of no effect in establishing rates thereafter."

charge [the defendant] for water and sewer pursuant to an agreement of the parties places [the plaintiff] in an untenable position. Since [the defendant] can refuse, and has unilaterally refused, to agree on price, [the plaintiff] would be forced to either cease the supply of water and sewer services to [the defendant], thereby allowing catastrophic issues to unfold for [the defendant's] residents, or capitulate to [the defendant's] price demands causing [the plaintiff] to supply [water and sewer services] at rates that are shockingly below [its] cost." We do not believe that the legislature reasonably could have intended such a result. In light of the plain mandate of § 7-239—which empowers municipalities like the plaintiff to set rates for the use of its waterworks system that are sufficient to satisfy its operation, repair, replacement and maintenance expenses, so long as they are "just and equitable," and to apply those rates to all users connected to the waterworks system—we conclude that the court properly construed § 7-239 as authorizing the plaintiff to set rates for the continued use of its waterworks system by properties located in the defendant municipality following the expiration of the contract between the parties in 2018.

B

The foregoing analysis applies equally to § 7-255, which concerns charges for sewer services.[18] Section

[18] General Statutes § 7-255 (a) provides in relevant part: "[A municipality's] water pollution control authority may establish and revise fair and reasonable charges for connection with and for the use of a sewerage system. The owner of property against which any such connection or use charge is levied shall be liable for the payment thereof. Municipally-owned . . . property which uses the sewerage system shall be subject to such charges under the same conditions as are the owners of other property . . . . No charge for connection with or for the use of a sewerage system shall be established or revised until after a public hearing before the water pollution control authority at which the owner of property against which the charges are to be levied shall have an opportunity to be heard concerning the proposed charges. . . . In establishing or revising such charges the water pollution control authority may classify the property connected or to be connected with the sewer system and the users of such system, including categories

7-255 (a) plainly and unambiguously authorizes a municipality to set "fair and reasonable charges" for the use of its sewerage system. Like § 7-239 (a), that provision broadly applies to all properties that are connected with and use that system. Nothing in § 7-255 confines its applicability to properties that are located within the municipality that owns the sewerage system.[19] If the legislature intended to impose such a limitation, it would have expressly done so. See *Ulbrich* v. *Groth,* 310 Conn. 375, 449, 78 A.3d 76 (2013); *State* v. *Payne,* 240 Conn. 766, 776, 695 A.2d 525 (1997), overruled in part on other grounds by *State* v. *Romero,* 269 Conn. 481, 849 A.2d 760 (2004).

For the same reasons articulated in part I A of this opinion, we reject the construction of § 7-255 advanced by the defendant and its related contention regarding absurd or unworkable results.[20] It would serve no useful purpose to repeat that discussion. We therefore conclude that the court properly determined that § 7-255 authorized the plaintiff to set rates for the continued use of its sewerage system by properties located in the defendant municipality following the expiration of the contract between the parties in 2018.

of industrial users, and . . . [m]ay give consideration to any factors relating to the kind, quality or extent of use of any such property or classification of property or users . . . . Any person aggrieved by any charge for connection with or for the use of a sewerage system may appeal to the superior court . . . ."

[19] Moreover, although § 7-273 provides that any municipality "may contract with any adjoining town or property owner therein for connection with and the use of [its] sewerage system," it does not obligate a municipality to do so. Cf. General Statutes § 7-148 (c) (4) (granting municipalities "the power" to "(H) [p]rovide for or regulate the collection and disposal of . . . waste material . . . *by contract or otherwise*" (emphasis added)).

[20] In its principal appellate brief, the defendant argues that "[s]imilar considerations establish that the trial court improperly construed § 7-255" and repeats its assertion that the court's interpretation creates an absurd result by providing "the plaintiff nearly unfettered power to charge its neighbors whatever it wants for sewer services."

II

The defendant also claims that the court improperly concluded that §§ 7-239, 7-255, and 7-258 impliedly authorize the plaintiff to sue the defendant to collect unpaid water and sewer service charges incurred by properties in the defendant municipality. We disagree.

As previously noted, the parties contracted for the provision of water and sewer services for more than sixty years. It also is undisputed that the defendant historically has acted as the collection agent for charges incurred by properties in the defendant municipality that use the plaintiff's waterworks and sewerage systems. In its memorandum of decision, the court specifically found that the defendant "directly charge[d] its residents for water and sewer services" provided by the plaintiff's waterworks and sewerage systems and then tendered payment to the plaintiff for those services.[21]

Despite that established practice—and despite the fact that the defendant continued to make partial payment to the plaintiff for water and sewer charges incurred by properties in the defendant municipality following the expiration of the parties' water and sewer service contracts in 2018—the defendant on appeal contends that the plaintiff lacks authority to sue the defendant to recover unpaid water and sewer charges. Rather, the defendant posits that the plaintiff's sole remedy to recover unpaid charges is to place liens on each individual property and then bring actions to foreclose

[21] Section 203 (B) of the parties' 2013 contract for water services obligated the defendant to "make payment of all charges described in this [a]greement to [the plaintiff] within thirty (30) calendar days of its receipt of an invoice." Article G of the parties' 2013 contract for sewer services provided that "Sewer User Charges and Sewer User Surcharges shall be billed to [the defendant] on a monthly basis" and that, "[i]f payment is not made within thirty (30) calendar days of such due date, the payment shall be deemed delinquent and subject to an interest penalty . . . ."

on those liens in the Superior Court pursuant to §§ 7-239 and 7-258.[22]

In its memorandum of decision, the court rejected that assertion and concluded that the statutory authorization to establish rates and charges necessarily includes the ability to collect unpaid service charges. We concur with that determination. Pursuant to the plain language of §§ 7-239 (a) and 7-255 (a), owners of property that use a municipal waterworks or sewerage system are liable for all charges incurred. At the same time, General Statutes § 7-148 (c) (2) expressly grants municipalities "the power" to "(B) regulate the mode of assessment and collection of taxes and assessments . . . including establishment of a procedure for the withholding of approval of building application when taxes or water or sewer rates, charges or assessments imposed by the municipality are delinquent for the property for which an application was made . . . ."[23] Accordingly, municipalities are authorized to regulate the manner in which assessments and charges incurred by their property owners for water and sewer services are collected.

---

[22] General Statutes § 7-239 (b) provides in relevant part: "The rates or charges established pursuant to this section [for the use of a waterworks system], if not paid when due, shall constitute a lien upon the premises served and a charge against the owner thereof . . . ."

General Statutes § 7-239 (j) provides in relevant part: "The amount of any such rate or charge [for the use of a waterworks system] which remains due and unpaid for thirty days may, with reasonable attorneys' fees, be recovered by the legislative body in a civil action in the name of the municipality against such owners. . . ."

General Statutes § 7-258 (a) provides in relevant part: "Any . . . unpaid . . . [sewer service] charge shall constitute a lien upon the real estate against which such charge was levied from the date it became delinquent. . . . The municipality may recover any such charges in a civil action against any person liable therefor. . . ."

[23] Notably, the court found that water and sewer charges levied by the defendant on properties in the defendant municipality contained two components: the rate for water and sewer services provided by the plaintiff and a separate charge for the defendant's "own customer service and infrastructure costs."

In our view, §§ 7-239, 7-255, and 7-258 cannot be read in isolation but, rather, must be read in light of the grant of statutory authority contained in § 7-148 (c) (2) (B) regarding municipal authority to proscribe the manner in which assessments and charges for water and sewer services are collected. "It is a basic tenet of statutory construction that statutes should be construed, where possible, so as to create a rational, coherent and consistent body of law." (Internal quotation marks omitted.) *Russo* v. *Waterbury*, 304 Conn. 710, 726, 41 A.3d 1033 (2012); see also *Doe* v. *Doe*, 244 Conn. 403, 428, 710 A.2d 1297 (1998) ("we read related statutes to form a consistent, rational whole, rather than to create irrational distinctions"); *In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992) ("the legislature in enacting statutes is presumed to be aware of the existence of other legislation on the same or related issues . . . and [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law" (citation omitted; internal quotation marks omitted)); *Robb* v. *Watertown*, Superior Court, judicial district of Waterbury, Docket No. 085166 (November 21, 1990) (2 Conn. L. Rptr. 830, 831) (construing §§ 7-148 (c) (2) (B), 7-148 (c) (4) (G) and 7-239 together and concluding that "[t]he statutory scheme [authorizes] the expenditure of [a municipality's] general fund revenues for a general purpose acquisition of water resources, while requiring users to pay user rates for the expenses related to their use of water").

Nothing in § 7-148 (c) (2) (B), § 7-239, § 7-255, or § 7-258 prohibits the defendant from permitting direct collection of water and sewer service charges by an outside entity, such as a water company or municipal provider. Indeed, § 7-258 (a) expressly authorizes that practice and provides in relevant part: "[F]or the purpose of collecting [service] charges any municipality

may enter into agreements with any water company or municipal water department furnishing water in such municipality for the purchase from such water company or municipal water department . . . and such agreement may designate such water company or municipal water department as a billing or collecting agent of the collector of sewerage system connection and use charges in the municipality. Any water company or municipal water department may enter into and fulfill any such agreements and may utilize for the collection of such charges any of the methods utilized by it for the collection of its water charges." The defendant, therefore, had the option, but was not obligated, to provide for the direct collection of water and sewer charges by a water company or municipal provider like the plaintiff.

When a municipality elects to collect water and sewer service charges incurred by properties within its geographical boundaries and then makes payment for those charges to the municipal provider—as the record unequivocally indicates the defendant did here following the expiration of the contract between the parties in 2018—the municipal provider necessarily may recover unpaid service charges from the collecting municipality. In this regard, we are mindful that "[a] municipality has only those powers that have been expressly granted to it by the state or that are necessary for it to discharge its duties and to carry out its objects and purposes." (Internal quotation marks omitted.) *Wright* v. *Woodridge Lake Sewer District*, supra, 218 Conn. 148.

The present case is not one in which individual property owners in the defendant municipality declined to pay water and sewer service charges. Rather, the defendant, on behalf of every user in the defendant municipality, made the decision not to pay in full the rates set by the plaintiff for water and sewer services provided after June 30, 2018. In such circumstances, it would be

absurd to interpret §§ 7-239, 7-255, and 7-258 to require the plaintiff to file liens on the thousands of individual properties in the defendant municipality that use its services and then commence foreclosure actions on each of those properties.[24] That construction is unworkable. We therefore conclude that, to carry out the purposes of §§ 7-239, 7-255, and 7-258, a municipality that provides water and sewer services to properties in another municipality necessarily is permitted to bring an action against that other municipality to recover unpaid charges when that other municipality has elected to collect payment for such charges incurred within its geographical boundaries.

### III

The defendant alternatively argues that, even if the plaintiff was authorized to maintain the present action, the court erroneously found the plaintiff's water and sewer service rates to be reasonable and equitable. That claim is unavailing.

At the outset, we note that "a trial court's findings regarding the reasonableness of utility rates is governed by [the] clearly erroneous standard of appellate review." (Internal quotation marks omitted.) *Highgate Condominium Assn.* v. *Watertown Fire District*, 210 Conn. 6, 21 n.7, 553 A.2d 1126 (1989). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is

[24] Courts properly may take judicial notice of the population of municipalities in this state. See, e.g., *D'Amico* v. *Willis*, 13 Conn. App. 124, 127 n.2, 534 A.2d 1248 (1987) (taking "judicial notice of the [fact] that the city of New Britain has a population of more than twenty-five thousand"), cert. denied, 207 Conn. 803, 540 A.2d 73 (1988); *Nesko Corp.* v. *Fontaine*, 19 Conn. Supp. 160, 162, 110 A.2d 631 (1954) ("[i]t is established that judicial notice may be taken of the . . . population of [a state's] counties, cities and villages"). We take judicial notice of the fact that the defendant had an estimated population of 21,790 in 2018. See Connecticut State Register and Manual (2018) p. 596.

evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 346 Conn. 391, 413–14, 291 A.3d 64 (2023).

Pursuant to § 7-239 (a), any rates or charges established for the use of a municipal waterworks system must be "just and equitable . . . ." Section 7-255 (a) similarly requires that charges for the use of a municipal sewerage system must be "fair and reasonable . . . ." As the defendant correctly notes in its principal appellate brief, those various terms are not defined in either statute and precedent "treats them as different names for the same thing . . . ." The focus of our inquiry, then, is into the reasonableness of the rates set by the plaintiff. See *Barr* v. *First Taxing District*, 151 Conn. 53, 58, 192 A.2d 872 (1963) ("[w]hether a rate is reasonable or unreasonable is primarily a question of fact, depending largely on the circumstances of the particular case").

In its memorandum of decision, the court first noted that General Statutes §§ 7-239 and 7-256 provide a baseline for water and sewer rates set by the plaintiff, as such rates should be "sufficient" to pay the operation, repair, replacement, and maintenance expenses of the waterworks system and the principal and interest requirements of bonds and notes related to the sewerage system. The court then found that the rates set by

the plaintiff for water and sewer services were reasonable because they were "based upon a study by independent experts . . . who studied [the plaintiff's] water and sewer operations, and recommended rates that would be sufficient to fund the short and long-term needs of the systems. . . . [The plaintiff] arrived at water and sewer rates that were below those recommended by [its] independent experts and below the rates necessary to fund the short and long-term financial needs of the [plaintiff's] systems." (Footnotes omitted.)

Those findings are supported by evidence in the record before us, particularly the March 31 and April 4, 2014 reports prepared by the independent water and sewer consultants retained by the plaintiff in 2014 to conduct studies and make recommendations on appropriate rates for water and sewer services. In those reports, the consultants found that the plaintiff's existing rates for water and sewer services were substantially lower than other comparable providers in Connecticut and were insufficient to meet the short-term and long-term needs of the plaintiff's waterworks and sewerage systems. The consultants then provided rate recommendations intended to meet those needs.[25] In their report on the plaintiff's waterworks system, the consultants recommended a rate of $2.97 per hundred cubic feet of water. Records of the plaintiff's Board of Alderman, which were admitted into evidence, nevertheless indicate that it adopted a rate of $2.52 per hundred cubic feet for 2018 through 2021, and $2.65 per hundred cubic feet for 2022. Although the consultants recommended a rate of $3.52 per hundred cubic feet of sewage in their report on the plaintiff's sewerage

---

[25] In the April 4, 2014 report, the consultants explained that "[t]he rates presented . . . are calculated on a 'break-even' basis. This means that they represent our best estimate for the rates needed to generate revenues equivalent to the projected cost of running the [waterworks system] . . . ." The March 31, 2014 report contained nearly identical language regarding the plaintiff's sewerage system rates.

system, records of the plaintiff's Board of Public Works, which also were admitted into evidence, indicate that the plaintiff adopted a rate of $2.472 per hundred cubic feet for 2018 through 2022. That evidence demonstrates that the plaintiff adopted rates for both water and sewer services that were *less* than those recommended by the independent consultants to meet the needs of their waterworks and sewerage systems.

Records of the proceedings before the plaintiff's Board of Alderman and its Board of Public Works also confirm that proper notice of the rates in question was provided and public hearings were held in accordance with the requirements of §§ 7-239 and 7-255. Moreover, in his testimony at trial, Mayor O'Leary confirmed that the rates adopted by the plaintiff were among the lowest in the state and less than other providers such as the Connecticut Water Company and Aquarion Water Company. That evidence substantiates the court's determination that the rates set by the plaintiff for water and sewer services were reasonable and equitable.

The defendant nevertheless maintains that the rates set by the plaintiff failed to account "for the defendant's status as a wholesale user" of its water and sewer services. Because it previously purchased water and sewer services at a lesser rate than other users pursuant to the contractual agreements between the parties, the defendant claims that, following the expiration of those contracts, it was entitled to discounted rates "that reflect [its] status as a large, wholesale customer."

Contrary to that assertion, nothing in our General Statutes obligates a municipality that provides water or sewer services to classify particular users of its water and sewer services or to provide discounted rates to certain classes of users. As the court noted in its memorandum of decision, §§ 7-239 and 7-255 "permissively provide that the relevant authority 'may' set different

rates for different classes of users and 'may' consider various factors in establishing rates for classes of users. . . . However, the statutes are clear that classes of users are permissively allowed but not required and that the considerations provided are also permissive and not exclusive. Accordingly, the public authorities may, but need not, establish classes of users and may set the rates in their reasonable discretion, subject to public notice and hearing, as is required to fund the operations in the short and long-term." (Citations omitted; footnote omitted.) The use of a uniform rate structure for all users, therefore, remains an option for municipal providers like the plaintiff.

At trial, the plaintiff submitted excerpts from a treatise prepared by the American Water Works Association concerning the use of uniform rates by water providers.[26] That treatise explains that a uniform rate "is a constant unit price for all metered volumetric units of water" that "can be applied to all customer or service classifications, such as residential, commercial, industrial, wholesale, and so on." American Water Works Association, Principles of Water Rates, Fees, and Charges—Manual of Water Supply Practices (7th Ed. 2017) c. IV.2, p. 109. It further notes that "[t]he uniform rate structure has gained relatively wide acceptance." Id., p. 113. In its memorandum of decision, the court credited that evidence in concluding that "[i]t was reasonable for [the plaintiff] to adopt a uniform system of pricing" for its water and sewer services.

That evidence also undermines the defendant's argument that the plaintiff was obligated to classify it as a

---

[26] The defendant initially submitted a portion of that treatise into evidence as exhibit QQ. In response, the plaintiff offered into evidence additional pages of that treatise that pertained specifically to the use of uniform rates, which had been omitted from the defendant's exhibit. In its memorandum of decision, the court found that the defendant's selective omission of the pages concerning uniform rates from exhibit QQ "undercut the defendant's credibility."

wholesale user and charge properties in the defendant municipality lower rates than it does for ones in the plaintiff city because they use less services and infrastructure. Because classification of users is permitted, but not required, under §§ 7-239 and 7-255, the court aptly noted that "there is no legal basis upon which one can unilaterally demand lower rates merely because one does not utilize all of the services offered." On appeal, the defendant has not provided any legal authority indicating that municipal providers like the plaintiff are prohibited from adopting a uniform rate structure for water and sewer services.

In addition, we note a practical difficulty with the defendant's contention. As the court aptly observed: "[A]llowing [the defendant] to claim special status . . . [as a wholesale user entitled to] reduced rates would either promote similar requests from other potential classes of users or impair the fairness of the [plaintiff's] rate system. . . . [The defendant] is not the only user of [the plaintiff's] water and sewer services that can claim to use less infrastructure or services than other customers. . . . [O]ther towns, large industrial users, commercial users, and large residential complexes are all charged by [the plaintiff] the same rates as each other and the same rates charged to each individual residence. Large industrial, commercial, and residential complexes maintain their own water and sewer 'distribution system' within their [own] property and complexes. Should they be charged less because of the foregoing or because they use very large volumes? Other surrounding towns pay the standard rates even though they deploy their own infrastructure and customer service. Should they pay less than the standard rates? On the other end of the scale, should the residence located next door to the sewer treatment facility pay less than residences located further away from the facility based upon pipe usage? Instead of engaging in

this endless level of gradation,[27] [the plaintiff] has chosen to impose uniform rates and the defendant has pointed to no legal compulsion that prevents [that] choice." (Footnote altered.)

Also relevant to the question of whether the application of uniform rates to properties in the defendant municipality is reasonable and equitable is the fact that, at all relevant times, the rates charged by the plaintiff also applied to properties in other municipalities. The court found, and the record confirms, that the same rates applied to properties in Cheshire, Middlebury, Naugatuck, and Prospect.

Lastly, we emphasize that the record contains ample evidence to support the court's finding that the plaintiff provided advance notice to the defendant of both its intent to move to a uniform rate structure once the contractual agreements between the parties expired in 2018 and the defendant's option to secure an alternative provider if the plaintiff's rates were not agreeable to the defendant.[28]

[27] "The [trial] court notes that [the plaintiff's] current accounting would not support this level of gradation, and in fact does not support the level of gradation sought by [the defendant], and [the defendant] knew this."

[28] At trial, Mayor O'Leary testified that, during negotiations in 2013 that resulted in those contractual agreements, he advised the defendant that the plaintiff "wanted to move towards" a uniform rate schedule and have properties in the defendant municipality pay the same rates as those in the plaintiff city and other municipalities. He further testified that the parties entered into the 2013 agreements with "an understanding" that, after those agreements expired, the uniform rate structure that applied in the plaintiff city and other municipalities would also apply to the defendant. In addition, Mayor O'Leary testified that, after negotiations between the parties failed to produce an agreement in 2018, the plaintiff informed the defendant that it would have to find "alternative sources" for water and sewer services and that he "encouraged" the defendant to do so. The court expressly credited Mayor O'Leary's testimony.

The record also contains a letter dated June 8, 2018, from Linda T. Wihbey, the plaintiff's corporation counsel, to the defendant's town manager, in which she noted that, "[f]or approximately one year, the [plaintiff] has represented to [the defendant] and its designated negotiating representatives, that [the plaintiff] was seeking rate equalization with [the defendant]

The record before us contains evidence to support the court's finding that the rates set by the plaintiff for water and sewer services were reasonable and equitable. Moreover, on our review of that record, we are not left with a definite and firm conviction that a mistake has been committed. Indulging every reasonable presumption in favor of the correctness of the court's ruling, as we are obligated to do; see *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 346 Conn. 414; we conclude that the court's finding is not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

---

similar to [other municipalities]." Wihbey then notified the town manager that, effective July 1, 2018, the plaintiff would be applying a uniform rate structure to users in all municipalities, including the defendant. Wihbey also noted that the defendant retained the option of not securing water and sewer services from the plaintiff, stating: "Should [the defendant] elect not to enter into a contract with [the plaintiff] at the reasonable rates set by [the plaintiff], please advise by June 15 so that we may facilitate any transitional service arrangements with your new supplier." In its memorandum of decision, the court credited that evidence.